*820 OPINION OF THE COURT
Abdus-Salaam, J.
In this action sounding in, among other things, negligence and fraud, plaintiff Fred Pasternack seeks to recover damages from defendants Laboratory Corporation of America Holdings (LabCorp) and ChoicePoint, Inc., arising from defendants’ alleged misconduct in performing and evaluating a random drug test that he was required to take as an airline pilot. We have accepted two certified questions from the United States Court of Appeals for the Second Circuit, asking us to determine (1) whether drug testing regulations and guidelines promulgated by the Federal Aviation Administration (FAA) and the Department of Transportation (DOT) create a duty of care for drug testing laboratories and program administrators under New York negligence law, and (2) whether a plaintiff may establish the reliance element of a fraud claim under New York law by showing that a third party relied on a defendant’s false statements resulting in injury to the plaintiff. We answer both questions in accordance with this opinion.
I
The underlying facts and procedural history are summarized as follows:
Plaintiff is a physician and part-time Northeastern Aviation Corporation airline pilot. He was required to submit to random drug testing pursuant to FAA regulations as part of its mandate to ensure “safety in air commerce and national security” (49 USC § 44701 [a] [5] [procedures for transportation workplace drug and alcohol testing programs]; see also 49 CFR part 40). ChoicePoint entered into a contract with Northeastern where *821 it agreed to help administer Northeastern’s drug program, including performing the services of a medical review officer (MRO). LabCorp, which provides specimen collection and drug testing services for private entities, entered into a contract with ChoicePoint to perform those services for Northeastern. When performing their duties under these contracts, both ChoicePoint and LabCorp were required to comply with the DOT Regulations and the DOT’s Urine Specimen Collection Guidelines (collectively, the DOT Regulations and Guidelines). The stated purpose of the DOT Regulations “is to establish a program designed to help prevent accidents and injuries resulting from the use of prohibited drugs or the misuse of alcohol by employees who perform safety-sensitive functions in aviation” (14 CFR 120.3).
On June 1, 2007, plaintiff was notified by Northeastern that he had been selected for random drug testing. On June 5, 2007, at about 1:10 p.m., he appeared for drug testing at a LabCorp site located in Manhattan. The urine sample plaintiff first produced at the test site was an insufficient quantity for testing. This is referred to under the DOT Regulations as a “shy bladder” situation. The DOT Regulations and Guidelines set forth procedures to be followed in such a situation, which include urging the employee to drink up to 40 ounces of fluid distributed reasonably through a three-hour period, or until the employee has provided a sufficient urine specimen (49 CFR 40.193; United States Department of Transportation, Office of Drug and Alcohol Policy and Compliance, Urine Specimen Collection Guidelines [Dec. 2006]). At the time that plaintiff was tested, the DOT Guidelines provided that “[t]he collector must specifically tell the employee that he or she is not permitted to leave the collection site and if they do so, that it will be considered a refusal to test” (DOT Guidelines at 20 [Dec. 2006]).[1]
*822 According to the complaint, Theresa Montalvo, a Patient Services Technician for LabCorp, told plaintiff that he would need to produce another urine sample, but did not explain the shy bladder procedure to him or urge him to drink additional fluids, and instead told him to return to the waiting room. Plaintiff did return to the waiting room, but believed it was unlikely that he could produce a sufficient urine sample before needing to depart the collection site for a scheduled aviation medical examination he was performing. He told Montalvo that he needed to leave, but would return to complete the test. Montalvo did not inform him that leaving the collection site would be considered a “refusal to test.” She did tell him that she was required to notify Northeastern that he was leaving and asked when he would return. Plaintiff told her she was free to contact Northeastern and that he would return the next day. He returned to the LabCorp facility around 4:00 p.m. that same day, and Montalvo called Northeastern and obtained permission to take a second urine sample from plaintiff. She noted on the chain-of-custody form (CCF), which Northeastern had given plaintiff pursuant to the DOT Regulations, that he had left and returned and that Northeastern had approved the second collection. Upon his return, plaintiff produced an adequate sample, which tested negative for prohibited drugs.
Plaintiff’s CCF was later reviewed by an MRO at Choice-Point, who determined that because plaintiff had left the collection site before the test was completed, there had been a “refusal to test” under the DOT Regulations. ChoicePoint reported this determination to the FAA, which prompted the FAA to interview Montalvo regarding the circumstances surrounding the urine specimen collection. As alleged by plaintiff, during the interview and in her subsequent signed statement, Montalvo did not tell the FAA investigators that plaintiff had told her during the initial collection that he planned to return to complete his collection. In November 2007, by emergency order, the FAA revoked all of plaintiff’s airman certificates, finding that he had engaged in a refusal to test. It subsequently terminated plaintiff’s designation as an Aviation Medical Examiner (AME) for the FAA, which gave him the authority to conduct FAA-mandated examinations for pilots. Thus, he was unable to pilot any flights or function as an AME.
*823 Plaintiff appealed the termination of his AME designation to the FAA and that appeal was denied. He also appealed the revocation of his airman certificates to the FAA. A hearing was held before an administrative law judge (ALJ) at which both plaintiff and Montalvo testified. Plaintiff claimed that he left the collection site with Montalvo’s acquiescence, while she testified that he rushed out of the facility before she could explain the shy bladder procedures to him. As previously noted, it was undisputed that Montalvo did not advise plaintiff that he would be deemed a “refusal to test” if he left the facility. The ALJ upheld the revocation, as did the National Transportation Safety Board (NTSB). Plaintiff appealed the NTSB’s decision to the Court of Appeals for the D.C. Circuit, which vacated the decision and remanded the matter to the NTSB, holding that the NTSB’s finding that Montalvo had been precluded from explaining the shy bladder procedure to plaintiff was not supported by substantial evidence (see Pasternack v National Transp. Safety Bd., 596 F3d 836 [2010]). In September 2010, the NTSB remanded the case to the ALJ, directing that the ALJ make the necessary credibility findings concerning the interaction between plaintiff and Montalvo. On remand, the ALJ again concluded that plaintiff had refused to test. The NTSB again affirmed. Plaintiff appealed to the D.C. Circuit, which ruled in his favor once more, holding that “substantial evidence does not support the NTSB’s determination that the collector did not impliedly give [plaintiff] permission to leave” and reversing the NTSB (Pasternack v Huerta, 513 Fed Appx 1, 2 [2013]). Subsequently, the FAA reinstated plaintiff’s airman certificates and AME designation and expunged the refusal to test from his record.
In June 2010, while his administrative appeal was still pending, plaintiff commenced this lawsuit to recover damages from LabCorp and ChoicePoint for the loss of his AME certification and airman certificates. The lawsuit alleged negligence and fraud in administering the test.
On August 1, 2011, the District Court granted ChoicePoint’s motion to dismiss (see Pasternack v Laboratory Corp. of Am., 2011 WL 3478732, 2011 US Dist LEXIS 88311 [SD NY, Aug. 1, 2011, No. 10-Civ-4426(PGG)]), concluding that plaintiff had not alleged any facts that supported a finding that ChoicePoint owed a duty of care to plaintiff. On September 6, 2012, the District Court granted plaintiff’s motion for leave to file a proposed second amended complaint as to LabCorp, but denied *824 plaintiff’s motion for leave to amend his complaint as to Choice-Point, concluding that it would be futile (see Pasternack v Laboratory Corp. of Am., 892 F Supp 2d 540 [2012]). Plaintiff filed a second amended complaint as to LabCorp, asserting claims for negligence, gross negligence, negligent misrepresentation, fraud, and injurious falsehood. Subsequently, the District Court granted LabCorp’s motion to dismiss (Pasternack v Laboratory Corp. of Am., 2014 WL 4832299, 2014 US Dist LEXIS 137671 [SD NY, Sept. 29, 2014, No. 10-Civ-4426(PGG)]), holding that with respect to the negligence claims, under New York law, LabCorp had no duty of care to properly apply federal drug testing regulations and guidelines, and regarding the fraud claims, that under New York law, a fraud claim cannot be based on a false representation made to and relied upon by a third party whose reliance causes injury to the plaintiff. On appeal to the Second Circuit, that court certified the aforementioned questions of New York law to this Court (807 F3d 14 [2015]) and we accepted the certification of the questions (26 NY3d 1074 [2015]).
II.
The Negligence Claims
Plaintiff alleges that ChoicePoint was negligent in mishandling the review and evaluation of his laboratory results in violation of the DOT Regulations. Although he asserts that ChoicePoint violated numerous DOT Regulations, he cites two regulations in particular: 49 CFR 40.123 (e), which provides that the MRO “must act to investigate and correct problems where possible and notify appropriate parties . . . where assistance is needed”; and 49 CFR 40.355 (i), which provides that, except where the employee has refused to test on the basis of adulteration or substitution, the MRO “must not make a determination that an employee has refused a drug or alcohol test” and that the ability to make such a determination “is a non-delegable duty of the actual employer.” Plaintiff argues that ChoicePoint failed to investigate the facts of his urine specimen collection and that it wrongfully designated him as a “refusal to test,” despite the regulation’s provision that the MRO is not to make such a determination. Plaintiff asserts that this designation was the sole reason for the FAA’s revocation of his airman certificates and his AME designation.
With respect to LabCorp, plaintiff alleges that LabCorp failed to explain the “shy bladder” procedures and failed to inform *825 him that leaving the collection site would or even could constitute a refusal to test, in contravention of 49 CFR 40.193 (b) and the DOT Guidelines.
In order to prevail on a negligence claim, “a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom” (Solomon v City of New York, 66 NY2d 1026, 1027 [1985]). In the absence of a duty, as a matter of law, there can be no liability (id. at 1028; see also Lauer v City of New York, 95 NY2d 95, 100 [2000] [“(w)ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm”]). The definition and scope of an alleged tortfeasor’s duty owed to a plaintiff is a question of law (see Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 585 [1994]). As this Court observed in 532 Madison Ave. Gourmet Foods v Finlandia Ctr. (96 NY2d 280 [2001]), courts “fix the duty point by balancing factors, including the reasonable expectations of [the] parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability” (96 NY2d at 288 [internal quotation marks and citations omitted]).
The FAA does not provide a private right of action for violations of FAA drug testing regulations (see Drake v Laboratory Corp. of Am. Holdings, 458 F3d 48, 64 [2d Cir 2006]). Thus, any duty to plaintiff for violations of the DOT Regulations and Guidelines must be based on a New York State common-law negligence theory of liability.
We have recently addressed duty of care in the drug testing context in Landon v Kroll Lab. Specialists, Inc. (22 NY3d 1 [2013]). In Landon, a drug testing laboratory allegedly performed a toxicology test in violation of industry-wide standards and failed to confirm the test, resulting in an erroneous report of drug use for a probationer. We held that the probationer had sufficiently alleged a negligence cause of action against the laboratory for failing to exercise reasonable care in the testing of his biological sample, concluding that the laboratory had a duty of care to perform the probationer’s drug test “in keeping with relevant professional standards” (id. at 6-7).
Thus, in Landon we held that a drug testing laboratory can be liable to a test subject under the common law for *826 negligent testing of a biological sample. We decline to extend Landon’s reasoning to impose a duty upon a laboratory to test subjects that requires the laboratory to adhere to aspects of the federal regulations and guidelines that do not implicate the scientific integrity of the testing process. We made clear in Landon that our holding regarding a duty of care owed by the laboratory to the plaintiff was limited to “th[o]se circumstances” — namely, a drug laboratory’s failure to adhere to professionally accepted scientific testing standards in the testing of the biological sample (id. at 7). It would be an unwarranted extension of Landon to recognize a duty to test subjects based upon the violation of ministerial federal regulations and guidelines unrelated to scientific integrity, especially when such regulations and guidelines are created to protect the public, not test subjects.[2] Landon’s limited ruling regarding the duty of care owed by laboratories to ensure accurate testing procedures does not encompass every step of the testing process, whether that process is governed by federal regulations and guidelines, or otherwise (see e.g. Matter of New York City Asbestos Litig., 5 NY3d 486, 493 [2005] [“A specific duty is required because otherwise, a defendant would be subjected ‘to limitless liability to an indeterminate class of persons conceivably injured’ by its negligent acts”]; see also Braverman v Bendiner & Schlesinger, Inc., 121 AD3d 353, 355-357 [2d Dept 2014], lv denied 24 NY3d 913 [2015] [plaintiff drug treatment program participant who alleged that laboratory was negligent in reporting positive results to the drug courts without labeling the results to indicate for “clinical purposes only” sought an “unwarranted expansion of the duty set forth in Landon”]). Recognizing a duty of care for any violation of federal regulations and guidelines unrelated to the actual performance of scientific testing of the biological sample would result in an unacceptable “proliferation of claims, [and] the likelihood of unlimited or insurer-like liability” (see Madison Ave, 96 NY2d at 288).[3]
In sum, the regulations and guidelines that are ministerial in nature and do not implicate the scientific integrity of the *827 testing process do not create a duty of care for drug testing laboratories and program administrators under New York negligence law.
III.
The Fraud Claims
The second certified question requires us to decide whether third-party reliance can establish the reliance element of a fraud claim. Plaintiff alleges fraud against LabCorp, contending that Montalvo, LabCorp’s employee, made false statements to the FAA investigators, which they relied on to plaintiff’s detriment. Specifically, plaintiff points to Montalvo’s statement to the FAA investigators that plaintiff was on his cell phone and uncooperative during the test, making it impossible to warn him of the consequence of leaving the testing site without giving a sample, which statement the FAA relied on in revoking plaintiff’s airman certificates. We hold that under New York law, such third-party reliance does not satisfy the reliance element of a fraud claim.
The elements of a fraud cause of action consist of “ ‘a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury’ ” (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011], quoting Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996]; see Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]). Federal courts applying New York law and the Appellate Division Departments have come to varying conclusions as to whether a plaintiff may state a fraud claim, despite the absence of reliance by the plaintiff on the alleged misrepresentations, where a non-plaintiff third party is alleged to have relied on the misrepresentations in a manner that caused injury to the plaintiff. The Second Circuit has held that “allegations of third-party reliance . . . are insufficient to make out a common law fraud claim under New York law” (City of New York v Smokes-Spirits.com, Inc., 541 F3d 425, 454 [2d Cir 2008], certified question answered 12 NY3d 616 [2009], revd and remanded on other grounds 559 US 1 [2010]; see Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v Lollo, 148 F3d 194, 196 [2d Cir 1998]; Shaw v *828 Rolex Watch, U.S.A., Inc., 673 F Supp 674, 682 [SD NY 1987]). Some district courts have applied the Second Circuit’s rule (see Mid Atl. Framing, LLC v Varish Const., Inc., 117 F Supp 3d 145, 153 [ND NY 2015]; Ahluwalia v St. George’s Univ., LLC, 63 F Supp 3d 251, 270 [ED NY 2014], affd 626 Fed Appx 297 [2d Cir 2015]), while others have held that, under New York law, third-party reliance can support a fraud claim (see Prestige Bldr. & Mgt. LLC v Safeco Ins. Co. of Am., 896 F Supp 2d 198, 205 [ED NY 2012]; Chevron Corp. v Donziger, 871 F Supp 2d 229, 257 [SD NY 2012]).
Similarly inconsistent is the Appellate Division case law, with the majority of cases declining to recognize third-party reliance and a few outliers adopting the opposite view (compare Bynum v Keber, 135 AD3d 1066, 1068 [3d Dept 2016], Wildenstein v 5H&Co, Inc., 97 AD3d 488, 490 [1st Dept 2012], Briarpatch Ltd., L.P. v Frankfurt Garbus Klein & Selz, P.C., 13 AD3d 296, 297 [1st Dept 2004], lv denied 4 NY3d 707 [2005], and Warren v Forest Lawn Cemetery & Mausoleum, 222 AD2d 1059, 1059 [4th Dept 1995] [holding that a plaintiff cannot claim fraud based on third-party reliance], with Ruffing v Union Carbide Corp., 308 AD2d 526, 528 [2d Dept 2003], and Buxton Mfg. Co. v Valiant Moving & Stor., 239 AD2d 452, 454 [2d Dept 1997] [fraud may exist where a false representation is made to a third party, resulting in injury to the plaintiff]).
The cases that recognize third-party reliance cite favorably to Eaton Cole & Burnham Co. v Avery (83 NY 31, 35 [1880]). However, as noted by the District Court and Second Circuit here, Eaton is distinguishable from this case because in Eaton the third party acted as a conduit to relay the false statement to plaintiff, who then relied on the misrepresentation to his detriment (see also Bruff v Mali, 36 NY 200, 206 [1867]). Eaton and its progeny stand for the proposition that indirect communication can establish a fraud claim, so long as the statement was made with the intent that it be communicated to the plaintiff and that the plaintiff rely on it. Eaton does not support plaintiff’s claim here, because Montalvo’s statements were not relayed to plaintiff, and he did not rely on them. Plaintiff, in arguing that third-party reliance is sufficient to state a fraud claim under New York law, cites this Court’s 1876 decision in Rice v Manley (66 NY 82 [1876]). There, the plaintiff contracted to purchase a quantity of cheese, and the defendant, aware of the plaintiff’s contract, fraudulently induced the cheese vendor to deliver the cheese to him rather than the plaintiff. The de *829 fendant falsely told the vendor that the plaintiff no longer desired the cheese. We upheld a referee’s determination that the defendant was liable to the plaintiff for damages as a result of the fraud, observing that “it matters not whether the false representations be made to the party injured or to a third party, whose conduct is thus influenced to produce the injury” (id. at 87). Notably, as recognized by the District Court here, in Rice v Manley, we stated that only two elements were required to sustain a fraud cause of action: fraud and damage (see id. at 84). In more recent history, however, this Court has made clear that a fraud claim requires, in addition to damage, a material misrepresentation or omission, inducement, and reliance (see Mandarin Trading Ltd., 16 NY3d at 178; Eurycleia, 12 NY3d at 559; Lama Holding Co., 88 NY2d at 421; see also 2A NY PJI2d 3:20 at 184 [2016] [“Generally, a plaintiff cannot claim reliance on misrepresentation that defendant made to third parties” unless the representation was intended to be communicated to plaintiff and for plaintiff to rely on it]). Thus, the holding in Rice rests upon antiquated elements of a fraud claim, and cannot be read to permit third-party reliance under the contemporary elements of the claim which clearly require reliance on the part of the party claiming to be fraudulently induced.
Indeed, this Court has stated on a number of occasions that a fraud claim requires the plaintiff to have relied upon a misrepresentation by a defendant to his or her detriment. This view is both consistent with other rules governing fraud claims (see e.g. First Natl. State Bank of N.J. v Irving Trust Co., 91 AD2d 543, 544 [1st Dept 1982] [“(T)here can be no liability in fraud where the complaining party is, in advance, fully knowledgeable and apprised of those matters as to which the representations are alleged to have deceived”], affd 59 NY2d 991 [1983]), and logical insofar as the tort of fraud is intended to protect a party from being induced to act or refrain from acting based on false representations — a situation which does not occur where, as here, the misrepresentations were not communicated to, or relied on, by plaintiff. We, therefore, decline to extend the reliance element of fraud to include a claim based on the reliance of a third party, rather than the plaintiff.
Accordingly, the certified questions should be answered in accordance with this opinion.

. The DOT Guidelines have since been revised to state that
“there is no requirement for the collector to inform the employee in a shy bladder situation that failure to remain at the collection site or otherwise fails to cooperate with the testing process constitutes a refusal. It is a best practice for the collector to inform the employee that such behavior could lead an employer to determine that a refusal occurred” (United States Department of Transportation, Office of Drug and Alcohol Policy and Compliance, Urine Specimen Collection Guidelines at 21 [July 2014], available at https://www.transportation.gov/sites/dot.gov/ *822 files/docs/Urine_Specimen_Collection_Guidelines_July3_ 2014_ A.pdf).

. The Sixth Circuit has observed that “[t]his regulatory scheme does not evince a concern for the protection of [employees] who believe that they have been aggrieved through the drug testing process” (Parry v Mohawk Motors of Michigan, Inc., 236 F3d 299, 309 [6th Cir 2000]).

. Accordingly, plaintiff’s proposed reformulation of the certified question to ask whether the common-law duty of care that this Court recognized in Landon applies to FAA mandated drug tests, provides plaintiff no succor.