Dibrino v Rockefeller Ctr. North, Inc. (2024 NY Slip Op 03558)

Dibrino v Rockefeller Ctr. North, Inc.

2024 NY Slip Op 03558

Decided on July 02, 2024

Appellate Division, First Department

Oing, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: July 02, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Cynthia S. Kern
Jeffrey K. Oing Peter H. Moulton Ellen Gesmer Manuel Mendez

Index No. 27729/19 Appeal No. 1299 Case No. 2022-05477 

[*1]Dominick Dibrino et al., Plaintiffs-Respondents,
v
Rockefeller Center North, Inc., et al., Defendants-Respondents, Turner Construction Company, Defendant, Dal Electrical Corporation, Defendant-Appellant.

Defendant DAL Electrical Corporation (DAL) appeals from the order of the Supreme Court, Bronx County (Lucindo Suarez, J.), entered October 28, 2022, which, insofar as appealed from as limited by the briefs, granted plaintiffs' motion for partial summary judgment as to liability on their Labor Law §�240(1) claim as against defendants Rockefeller Center North Inc. and JRM Construction Mgmt LLC, denied so much of defendant DAL's motion seeking summary judgment dismissing plaintiffs' Labor Law §�200 and common-law negligence claims and Rockefeller and JRM's contractual indemnification cross-claim as against it, and granted so much of Rockefeller and JRM's cross-motion seeking summary judgment on their contractual indemnification cross-claim against DAL.

Pillinger Miller Tarallo, LLP, Elmsford (John T. Kalin and Wendy Eson of counsel), for appellant.
Kahana & Feld LLP, New York (Sofya Uvaydov, Timothy R. Capowski and Sarah Pavlini of counsel), for Rockefeller Center North, Inc. and JRM Construction MGMT LLC, respondents.
Pollack, Pollack, Isaac & DeCicco, LLP, New York (Jillian Rosen, Brian J. Isaac and Gregory Freedman of counsel), for Dominick Dibrino and Alison Dibrino, respondents.
OING, J.
This personal injury action stems from a construction site accident in which plaintiff Dominick DiBrino fell from a ladder and was injured. Rockefeller Center North Inc. owned the premises located at 1271 Avenue of the Americas where the accident occurred, and JRM Construction Mgmt LLC was the construction manager and general contractor for the work. JRM subcontracted the electrical work to DAL Electrical Corporation and subcontracted the drywall and ceiling work to plaintiff's employer, nonparty Jacobson & Company. Rockefeller retained JRM to outfit the interior of the fifth through ninth floors of the premises to be the new headquarters for Major League Baseball.
The following facts are undisputed. On the morning of the accident, plaintiff used a Jacobson six-foot A-frame ladder and a rolling Baker scaffold to take measurements and mark out the soffit along the ceiling in the building's fifth-floor pantry in preparation for installing a specialty ceiling feature. All the workers had unrestricted access to the floor. After plaintiff completed his task, he disassembled the scaffold and brought it and the ladder to another location on site to perform a different task. During plaintiff's lunch break, a fellow Jacobson employee informed him that the measurements needed to be checked. Plaintiff returned to the fifth-floor pantry with his foreman to review the measurements. He did not retrieve a Jacobson ladder or rolling scaffold, but instead used a six-foot A-frame ladder that was already set up in an open position in the area. He did not ascertain who owned the ladder before using it. Plaintiff climbed up and down the ladder several times, confirming measurements, for approximately 15 minutes. He then climbed to the second or third rung of the ladder [*2]to begin measuring above his head. The ladder moved and wobbled and plaintiff lost his balance. He tried to jump off the ladder to avoid injury, but his foot became stuck in one of the rungs and he fell, causing him to sustain injuries. At the time of his accident, plaintiff did not know who owned the ladder. He learned later that it was owned by DAL, who did not supply plaintiff with the ladder or give him permission to use it.
Plaintiff and his wife commenced this action and asserted claims, pursuant to Labor Law §§ 200, 240 (1) and 241(6), against JRM and Rockefeller (together, defendants), and against DAL. Plaintiffs also asserted a claim for common-law negligence against DAL, contending that DAL's ladder was defective, and that by leaving an allegedly defective ladder unattended, DAL created an unreasonable risk of harm that was a proximate cause of his injuries. Defendants cross-claimed against DAL for, among other things, contractual indemnification.
As is relevant to this appeal, Supreme Court granted plaintiffs' motion for partial summary judgment as to liability on their Labor Law § 240(1) claim against defendants, denied DAL's motion for summary judgment dismissing plaintiffs' Labor Law § 200 and common-law negligence claims and defendants' contractual indemnification cross-claim as against it, and granted defendants' cross-motion for summary judgment on their contractual indemnification cross-claim against DAL.
Supreme Court properly granted plaintiffs' motion for partial summary judgment on the issue of liability on their Labor Law § 240(1) claim as against defendants. Plaintiffs met their prima facie burden by establishing that defendants failed "to properly secure the ladder against movement or slippage and to ensure that it remained steady and erect" while plaintiff was on it (Ping Lin v 100 Wall St. Prop. L.L.C., 193 AD3d 650, 651 [1st Dept 2021]; see Kijak v 330 Madison Ave. Corp., 251 AD2d 152, 153 [1st Dept 1998]). Although defendants took no position on this issue on appeal, DAL appealed this determination andrelied upon accident reports created shortly after plaintiff's fall that demonstrated that it was caused by his own overreaching and failure to maintain three points of contact with the ladder. None of those reports, however, were created by anyone with personal knowledge of the circumstances surrounding plaintiff's accident (see Pirozzo v Laight St. Fee Owner LLC, 209 AD3d 596, 597 [1st Dept 2022]). Further, while some of those accident reports relied on statements by plaintiff's foreman — the only other person present when the accident happened — and although the foreman testified that the accident "probably" occurred because plaintiff "was . . . up overreaching," the foreman also admitted that he "wasn't looking directly at" plaintiff when the accident occurred, and that he only saw the ladder moving in his peripheral vision. Moreover, the foreman admitted that there was no way for plaintiff to do the work that needed [*3]to be done while maintaining three points of contact with the ladder. Finally, even if plaintiff fell because he lost his footing on the ladder, this does not defeat plaintiffs' Labor Law § 240(1) claim (see Merino v Continental Towers Condominium, 159 AD3d 471, 473 [1st Dept 2018]; Rom v Eurostruct, Inc., 158 AD3d 570, 570-571 [1st Dept 2018]).
Supreme Court, however, should have granted DAL's motion for summary judgment dismissing the Labor Law § 200 claim as against it. Labor Law § 200 "is a codification of the common-law duty imposed upon an owner or general contractor to maintain a safe construction site" (Rizzuto v L.A. Wenger Contr. Co., 91 NY2d 343, 352 [1998]). Because DAL was not an owner, a general contractor, or a statutory agent of an owner or general contractor, the Labor Law § 200 claim against it could not stand (see id.; Russin v Louis N. Picciano & Son, 54 NY2d 311, 316-317 [1981]).
We further find that Supreme Court should have also granted DAL's motion for summary judgment dismissing the common-law negligence claim against it. In disagreeing with our position, our dissenting colleague points to the fact that the ladder had blue tape with no markings affixed horizontally to the ladder's top three rungs, and to DAL's foreman's EBT testimony that if a ladder was in disrepair he would place blue tape on it with a written notation to not use it. Because "it was reasonably foreseeable that a worker might use the apparently defective ladder and sustain an injury," the dissent concludes, the ladder's "presence at the job site [in its condition] clearly constituted a dangerous condition." Thus, the dissent, relying on principles of foreseeability, contends that a factual issue exists as to "whether DAL launched a force or instrument of harm by placing what appeared to be a defective ladder at the job site." Although initially relying on DAL's foreman's testimony to find that the ladder appeared to be defective, the dissent inexplicably, in the end, based on the same testimony, concludes that the "ladder was defective" and "should have been discarded." The dissent then determines that "there is an issue of fact as to whether DAL in discharging its contractual obligation created an unreasonable risk of harm to others by launching an instrument of harm [i.e., a defective ladder that should have been discarded], creating a duty to the plaintiff." We respectfully disagree with the dissent's reasoning.
The principle is well settled that a finding of negligence requires the breach of a duty because, in the absence of a duty, there is no breach and, without a breach, there is no liability (see Pulka v Edelman, 40 NY2d 781, 782 [1976]). That is, if a defendant owes no duty to a plaintiff, "there can be no liability in damages, however careless the conduct or foreseeable the harm" (Lauer v City of New York, 95 NY2d 95, 100 [2000], citing Pulka, 40 NY2d at 785). As to how foreseeability of harm interconnects with the imposition of a duty of care[*4], this Court restated the principle in On v BKO Express LLC (148 AD3d 50 [1st Dept 2017]). Citing Pulka (40 NY2d 781), this Court explained that foreseeability should not be confused with duty and may not be relied on to create a duty (id. at 55). Instead, this Court held that the principle of foreseeability is applicable to determine the scope of the duty only after it has been found to exist, and that if there is no duty, then the principle is inapplicable and the foreseeability of the accident is irrelevant (id.).
Here, given that DAL did not enter into a contract with plaintiff or his employer, a duty of care to plaintiff cannot arise out of a contractual relationship (see Espinal v Melville Snow Contrs., 98 NY2d 136, 138 [2002]). Any contractual obligations DAL may have had to its employees or to JRM, the general contractor, did not extend to plaintiff (id.). The question that remains is whether DAL may still owe a duty of care to plaintiff. Generally, a contracting party does not owe a duty of care to a noncontracting third party (id.). There are three well-settled exceptions to this general rule: (1) where the contracting party, in failing to exercise reasonable care in the performance of his or her duties, launches a force or instrument of harm; (2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties; and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely (id. at 140).
As to the Espinal factor of reliance, DAL aptly argues that the record is devoid of evidence that plaintiff relied on the services of DAL because plaintiff received his instructions and equipment from his foreman, not DAL. Concerning the displacement factor, the record is devoid of evidence that DAL displaced Jacobson's, plaintiff's employer, duty to oversee plaintiff's work, or JRM's duty to ensure the safety of the worksite, because the testimony established that JRM, as the general contractor, hired the contractors and coordinated and supervised their work. Plaintiff's failure to address these two factors on appeal amounts to a concession. That leaves the issue of whether DAL launched a force or an instrument of harm to warrant the imposition of a duty of care on DAL for plaintiff's benefit. This Court's decisions in Ramos v Pet Mkt. W. 57th St., Inc. (114 AD3d 423 [1st Dept 2014]) and Vargas v New York City Tr. Auth. (60 AD3d 438 [1st Dept 2009]) provide meaningful instruction.
In Ramos, the plaintiff employee of one subcontractor used a ladder alleged to be owned by the other subcontractor, and sustained injuries when he fell off of it. This Court held that the other subcontractor "owed no duty to plaintiff" because it "had no part in causing or augmenting the injury" given that it "was not present at the time of the accident, had not supplied plaintiff with the ladder, had no supervision, direction or control over plaintiff's work, and had no duty to provide [*5]him with safe equipment" (114 AD3d at 424 [internal quotation marks and brackets omitted]).
In Vargas, a subcontractor provided the plaintiff with a ladder that was allegedly insufficient in height to use, and it collapsed while he was using it in a closed position. This Court held that the subcontractor that furnished the ladder was entitled to dismissal of all claims against it because it "was not in contractual privity with [the] plaintiff's employer, . . . had no supervision, direction or control over [the] plaintiff's work, and . . . had no duty to provide [the plaintiff] with equipment adequate for the performance of his work" (60 AD3dat 441). Thus, the plaintiff's injuries did not arise from the subcontractor's work and were not caused by any fault attributable to the subcontractor (id.).
The dissent aptly notes that neither decision cited Espinal in reaching their holdings. Because both decisions postdate Espinal, however, Espinal had to have informed this Court because the reasoning expressed embraced the Espinal principles in holding that the noncontracting subcontractors under the factual circumstances therein did not launch a force or instrument of harm that would warrant the imposition upon them of a duty of care to a noncontracting third party.
Our facts are virtually indistinguishable from Ramos and Vargas. Although the condition of the ladder is disputed, the record establishes that the DAL ladder was left by a DAL employee in the fifth-floor pantry at some point in the late morning on the day of accident, and that plaintiff saw the unattended ladder when he returned to the fifth-floor pantry to review his measurements from earlier that morning. Plaintiff did not know or ascertain who owned the ladder, but he did know it was not a Jacobson ladder. The record also establishes that plaintiff did not obtain permission to use the ladder, that DAL did not supply or provide plaintiff with the ladder for use to complete his tasks, that DAL had no duty to provide plaintiff with a safe or adequate ladder, and that DAL did not supervise, direct or control plaintiff's work. Applying Ramos and Vargas to these facts, DAL did not launch a force or instrument of harm. Thus, under Espinal, DAL did not owe a duty of care to plaintiff, and plaintiff's common-law negligence claim against it cannot stand. Because we find that DAL did not owe a duty of care to plaintiff, the foreseeability principles posited by the dissent as a basis to find a factual issue are not applicable (see On, 148 AD3d at 55). Poracki v St. Mary's R.C. Church (82 AD3d 1192 [2d Dept 2011]) and Higgins v 1790 Broadway Assoc. (261 AD2d 223 [1st Dept 1999]), relied on by the dissent, do not, respectfully, support the dissent's position. The Poracki Court did not apply the Espinal analysis because the case involved an employee of the general contractor, the plaintiff, and one of the subcontractors, the defendant, hired by and in privity of contract with the plaintiff's employer[*6]. The plaintiff alleged that a subcontractor's employee removed wooden planks from the scaffolding, leaving a two-foot-wide hole, through which the plaintiff fell. The Poracki Court applied the unreasonable risk of harm analysis, as opposed to Espinal, because the case involved a claim between a general contractor's employee and a subcontractor, and involved the question of whether the subcontractor negligently performed its work, thereby creating a condition that caused the plaintiff's injury (82 AD3d at 1195-1196). It did not involve a negligence claim against a subcontractor that was not in privity with the plaintiff, or his or her employer. Higgins also did not implicate Espinal. Instead, this Court addressed a defective condition arising out of an alleged breach of the proprietary duty of property owners and statutory agents to maintain a safe premises (see Higgins, 261 AD2d at 224). In that regard, this Court found that the Labor Law § 200 and common-law negligence claims against the building owner and building manager survived a motion for summary judgment because "[a]n owner of real property is obligated to maintain the premises in reasonably safe condition, with foreseeability being the measure of the proprietary duty" (id.). The negligence claim was not asserted against a subcontractor that was not in privity with the plaintiff, or his or her employer, but, instead, against the property owner, implicating premises liability principles. Church v Callanan Indus. (99 NY2d 104 [2002]) and Cando v Ajay Gen. Contr. Co. Inc. (200 AD3d 750 [2d Dept 2021]) are distinguishable. In addressing the limited situations in which the duty of care to noncontracting third parties may arise out of a contractual obligation or the performance thereof, the Church court, in restating the three Espinal exceptions, held that the facts therein did not come within those exceptions so as to impose a duty on the defendant. Unlike here, the facts in Church did not implicate common-law negligence claims involving noncontracting parties in the Labor Law context.
The Cando Court, in finding that there was a triable issue as to whether there was a launch of a force or instrument of harm, held that the complaint in a related action "alleged facts which would establish that [the subcontractor] launched a force or instrument of harm by alleging that [the subcontractor] provided the plaintiff with an unsecured and unstable ladder, which caused his injuries (200 AD3d at 753 [emphasis added]; see also Greco v Archdiocese of N.Y., 268 AD2d 300, 301 [1st Dept 2000] [finding issues of fact as to whether the defendant supplied the plaintiff with a defective ladder]). Here, there is no dispute that DAL did not provide or supply plaintiff with the ladder and that plaintiff used the ladder without DAL's knowledge. Breslin v Macy's, Inc. (211 AD3d 569 [1st Dept 2022]) does not counsel a different outcome. There, although not citing Espinal, the facts implicated Espinal and its first [*7]exception. In denying the defendant's motion for summary judgment, this Court found that the allegation that there was an affirmative act of creating a dangerous condition was sufficient to warrant a jury trial. In Breslin, the defendant's employee purposefully stepped on one of the legs of the ladder in an effort to bend it to render it unusable just prior to the plaintiff using the ladder (see Trawally v City of New York, 137 AD3d 492, 492 [1st Dept 2016] ["a contractor launches a force or instrument of harm where its affirmative act creates a dangerous c0ndition"]). Here, the blue tape affixed horizontally to the ladder's top three rungs with no notation to refrain from using it does not, without more, amount to an affirmative act by DAL under Breslin. In fact, on appeal, plaintiff makes no mention of the blue tape as a basis to argue that this evidence is indicative that the ladder was defective.
Dismissal of defendants' contractual indemnification cross-claim is warranted. "The right to contractual indemnification depends upon the specific language of the contract" (Trawally, 137 AD3d at 492-493 [internal quotation marks omitted]). The three indemnification provisions in defendants' subcontract with DAL contain scope-of-work triggers; that is, DAL is contractually obligated to indemnify defendants for accidents arising out of the scope of its work. In defining the scope of DAL's work, defendants point to a provision requiring DAL to "provide, or cause to be provided, to each of [its] employees or agents, the proper safety equipment for the duties being performed by that worker and [] not permit any worker to perform any part of the Work who fails or refuses to use same." However, it is undisputed that plaintiff was not DAL's employee or agent; nor is there any record evidence that plaintiff was injured as a result of a DAL employee's performance or completion of a task that DAL was contractually obligated to do. Thus, the scope-of-work provision was not triggered (see Caras v Geroge Comfort & Sons, Inc., — AD3d &mdash, 2024 NY Slip Op 02585 [1st Dept 2024]; Basile v Legacy Yards Tenant LP, 205 AD3d 531 [1st Dept 2022]; cf. Urbina v 26 Ct. St. Assoc., LLC, 46 AD3d 268, 270-271 [1st Dept 2007] [noting that the scope-of-work provision included specific tasks, including furnishing scaffolding, and that because the plaintiff was injured while using the scaffolding erected by the subcontractor, the scope-of-work provision was triggered and summary judgment granting contractual indemnity against the subcontractor was proper]; see also Payne v NSH Community Servs., Inc., 203 AD3d 546, 548 [1st Dept 2022]; Keena v Gucci Shops, Inc., 300 AD2d 82, 82 [1st Dept 2002]). Although at least one of the indemnification provisions in the subcontract requires DAL to indemnify defendants for any claims arising out of "the negligence or willful misconduct or negligent acts or omissions of [DAL] or [its] . . . employees," this clause also was not triggered in light of [*8]our dismissal of plaintiff's common-law negligence claim.
Accordingly, the order of the Supreme Court, Bronx County (Lucindo Suarez, J.), entered October 28, 2022, which, insofar as appealed from as limited by the briefs, granted plaintiffs' motion for partial summary judgment as to liability on their Labor Law § 240(1) claim as against defendants Rockefeller Center North Inc. and JRM Construction Mgmt LLC, denied so much of defendant DAL Electrical Corporation's motion seeking summary judgment dismissing plaintiffs' Labor Law § 200 and common-law negligence claims and Rockefeller and JRM's contractual indemnification cross-claim as against it, and granted so much of Rockefeller and JRM's cross-motion seeking summary judgment on their contractual indemnification cross-claim against DAL, should be modified, on the law, to grant DAL's motion as to the Labor Law § 200 and common-law negligence claims, and contractual indemnification cross-claim as against it, and to deny Rockefeller and JRM's cross-motion as to their contractual indemnification cross-claim against DAL, and otherwise affirmed, without costs. The Clerk is directed to enter judgment dismissing the complaint and all cross-claims as against DAL.
All concur except Mendez, J., who dissents in an Opinion.

MENDEZ, J. (dissenting)
This personal injury action stems from a construction site accident in which plaintiff Dominick DiBrino fell from a ladder owned by DAL Electrical Corporation. Rockefeller Center North Inc. owned the premises at which the accident occurred; JRM Construction Mgmt LLC was the construction manager and general contractor for the work; DAL was the electrical subcontractor on the project; and nonparty Jacobson & Company, plaintiff's employer, was the drywall and ceiling subcontractor. Plaintiff commenced this action and asserted claims pursuant to Labor Law §§ 200 and 240(1) amongst other sections, and for common-law negligence.[FN1] Rockefeller and JRH (together "defendants") cross-claimed against DAL for, among other things, contractual indemnification. After completion of discovery, plaintiff moved for partial summary judgment on the issue of liability on his Labor Law § 240(1) claim as against DAL and defendants. DAL separately moved for summary judgment dismissing plaintiff's Labor Law § 200 and common-law negligence claims and defendants' contractual indemnification cross-claim. Defendants cross-moved against DAL for summary judgment on their contractual indemnification cross-claim.
Supreme Court granted plaintiff's motion for partial summary judgment against defendants only on his Labor Law § 240(1) claim; denied DAL's motion for summary judgment dismissing plaintiff's Labor Law § 200 and common-law negligence claims and defendants' contractual indemnification cross-claim; and granted defendants' cross-motion for summary judgment against DAL on their contractual indemnification cross-claim.
DAL appeals from Supreme Court's order denying its motion and granting [*9]defendants' cross-motion. The majority would modify Supreme Court's order to grant DAL summary judgment dismissing plaintiff's Labor Law § 200 and common-law negligence claims, deny defendants' cross-motion for summary judgment on their contractual indemnification cross-claim, and grant DAL summary judgment dismissing that cross-claim. I agree with the majority insofar as dismissing plaintiff's Labor Law § 200 claim against DAL. However, I disagree that plaintiff's common-law negligence claim and defendants' contractual indemnification cross-claim should be dismissed.
I would find that, on the specific facts of this case, DAL owed a duty to plaintiff and that there is an issue of fact whether DAL launched an instrument of harm by creating or exacerbating a dangerous condition and making the worksite unsafe. Since there is an issue of fact with respect to DAL's negligence, I would deny DAL summary judgment dismissing plaintiff's common-law negligence claim and defendants' contractual indemnification cross-claim as against it and would also deny defendants summary judgment on their contractual indemnification cross-claim. Therefore, I respectfully dissent.
Plaintiff is an employee of Jacobson, the drywall and ceiling subcontractor. He testified at an examination before trial that on the morning of the accident, he was tasked with taking measurements and marking out the soffit along the ceiling in the building's fifth-floor pantry in preparation for installing a specialty ceiling feature. He used a Jacobson six-foot A-frame ladder and a Baker scaffold to complete this task. After completing this task, he disassembled the scaffold and moved both the scaffold and the ladder to another floor to complete a different task. During his lunch break, he was informed by one of his foremen that the measurements he took on the fifth floor appeared to be incorrect and needed to be re-checked. Therefore, after lunch, plaintiff returned to the fifth-floor pantry with one of his foremen to re-check the measurements.
In order to confirm his measurements, plaintiff needed to use the same equipment he had used that morning, a six-foot A-frame ladder and a Baker scaffold. However, since he had already removed the equipment he was using to another floor, it would have taken him over an hour to bring them back to the fifth floor, while, confirming his measurements would not have taken more than a few minutes. Therefore, he decided to use a six-foot A-frame ladder that was already opened and set up on the fifth floor near the pantry area when he got there. He did not check to see who owned the ladder, which looked fine to him when he took it.
While plaintiff was trying to confirm some of his measurements, the ladder moved and wobbled, and he lost his balance. He tried to jump off the ladder to avoid injury, but his foot became stuck in one of the rungs and he fell. He landed on a pair of snips in his toolbelt, which punctured and impaled his abdomen, causing serious [*10]physical injuries.
Plaintiff's foreman, who assisted him in confirming the measurements, testified at an examination before trial that although a worker was not supposed to use any other trade's ladders, everybody did because it was easier and faster than getting a ladder from somewhere else. When he and plaintiff got to the pantry area, the ladder was already there, open and set up. The ladder looked fine, and no one told plaintiff not to use it or to use a different ladder. He and plaintiff just checked the ladder "real quick" and plaintiff grabbed the ladder because that was the practice on the jobsite. He later found out that the ladder was not a Jacobson ladder but a DAL ladder. He found it "funny that [this] particular ladder had blue masking tape on it, [when] none of the other ladders had it." He had "no idea" what purpose the blue masking tape served. None of the Jacobson ladders on the project had blue masking tape on it.
JRM's lead superintendent testified at an examination before trial that he appeared at the accident site within minutes of the accident and photographed the area and the ladder. The photograph taken of the accident scene showed the ladder, with blue tape on the rungs, in the position it was in when he got there. Later that day, he had the ladder retrieved from DAL's shanty for safekeeping. He stated that there were hundreds of ladders on this 400,000 square-foot, hectic jobsite.
DAL's on-site general foreman, Richard Ryan, testified that his duties and responsibilities included ensuring that all DAL material and equipment at the jobsite was in safe condition for use. To make sure they were safe, he checked DAL's equipment, specifically the ladders, at the end of the night or in the morning. He would make sure the hinges on the side were not bent and he would check the stepping and nonstepping rungs to make sure the ladders were in safe working order. If he felt a ladder was not in safe working order, he would take it out of service immediately. If he discovered that one of the six-foot A-frame ladders had rungs on the nonstepping side that were bent, he would take the ladder out of service and would not let it be used.
Ryan stated that, if he discovered a ladder was in disrepair, either at the end or beginning of the day, he would put blue painter's tape around it and place it in the shanty with "do not use" written on it. He would throw the ladder in a dumpster and write on the blue tape, "please throw away, do not use."
When shown a photograph of the ladder plaintiff was using at the time of his accident, Ryan testified that the rung appeared damaged and that, if he saw a ladder in that condition, he would remove it from the jobsite. He would not allow the use of such a ladder because damage to a nonstepping rung, as shown in the photograph, could affect the ladder's stability and he would be sufficiently concerned to take it out of service.
It is significant that Ryan stated that the ladder plaintiff used [*11]was brought to the pantry area sometime after lunch by a DAL employee who was to be doing some work in that area. Although the DAL employee did not see plaintiff's accident, he did hear plaintiff fall.
DAL's senior project manager, George Abdilla, also testified at an examination before trial. He was shown a photograph of the ladder plaintiff was using at the time of his fall. He stated that, "the rung look[ed] damaged," that "[i]t doesn't look like [the ladder] should stay in service," and that "without opening it up and checking the stability of the ladder, [his] recommendation would be getting rid of [it]." He had no idea why the ladder was in the pantry area or why it had blue painter's tape on it. Significantly, he stated that he assumed that on the day of the accident, the ladder was unlocked by somebody from DAL and then put into use by a DAL employee.
Ryan testified that DAL had an unwritten policy, which was not communicated to the other trades but "it's kind of what everybody knows. . . . You don't use somebody else's stuff. . . .other materials, other ladders. . . .Everybody has their own ladders. You don't allow other trades to use your ladders." However, according to Abdilla, this rule was only enforced if the foreman was asked by another trade to use a DAL ladder. He further stated that if a ladder was open, set up and unattended, there was no way of enforcing DAL's policy of not having other trades use DAL ladders "unless at every aspect of the job, when you are not on that ladder, you go and lock it up in the corner and then unlock it when you come back. . . .[t]he only policy that we have is we actually tell the trades when they ask for a ladder . . . . that we do not lend out our ladders . . . . That's the only enforcement we have [at the] jobsite."
JRM and DAL entered into a Master Subcontract Agreement, which required that DAL comply with OSHA requirements and provide the proper safety equipment for the duties to be performed, including defect-free ladders.
Ordinarily, the breach of a contractual obligation will not be sufficient in and of itself to impose tort liability upon a promisor for the benefit of a noncontracting third party. However, the promisor is subject to tort liability for failing to exercise due care in the execution of a contract when the promisor, while engaged affirmatively in discharging a contractual obligation, creates an unreasonable risk of harm to others or increases that risk - that is, if it launches a force or instrument of harm (Church v Callanan Indus., 99 NY2d 104, 111 [2002]; Espinal v Melville Snow Contrs., 98 NY2d 136, 139-141 [2002]). Thus, a contractor may be said to have assumed a duty of care and be potentially liable in tort to third persons when the contractor, in failing to exercise reasonable care in the performance of its duties, launches a force or instrument of harm (Cando v Ajay Gen. Contr. Co. Inc., 200 AD3d 750, 753 [2d Dept 2021]). A contracting party launches an instrument [*12]of harm when it affirmatively creates a hazard that results in a plaintiff's injury (see Breslin v Macy's, Inc., 211 AD3d 569, 570 [1st Dept 2022]; Trawally v City of New York, 137 AD3d 492, 492 [1st Dept 2016]).
A subcontractor launches a force or instrument of harm where its affirmative act creates a dangerous condition. A subcontractor is not entitled to summary judgment in its favor on a negligence cause of action where the evidence raises a triable issue of fact as to whether the subcontractor's employee created an unreasonable risk of harm that was the proximate cause of the plaintiff's injury (see Poracki v St. Mary's R.C. Church, 82 AD3d 1192, 1195 [2d Dept 2011]).
On this record, we can conclude that there is an issue of fact as to whether DAL launched a force or instrument of harm by placing what appeared to be a defective ladder at the jobsite. The record establishes that the ladder belonged to DAL; that it had bent rungs and thus appeared to be defective; that DAL knew of the ladder's condition because it had placed blue painter's tape on it which, in accordance with DAL's on-site foreman's testimony, meant that it was defective and should have been discarded; that a DAL worker brought the ladder to the worksite, opened it and set it up for use; that DAL was aware that other trades used their ladders; that plaintiff, who was unaware of the significance of the blue tape on the ladder, used the ladder; and that, while in use, the ladder wobbled, causing plaintiff to fall and sustain an injury.
As it was reasonably foreseeable that a worker might use the apparently defective ladder and sustain an injury, its presence at the jobsite clearly constituted a dangerous condition (see Higgins v 1790 Broadway Assocs., 261 AD2d 223, 225 [1st Dept 1999]). Since there is an issue of fact as to whether DAL created the hazard that resulted in plaintiff's injury, its motion to dismiss plaintiff's common-law negligence claim should be denied (see Breslin, 211 AD3d at 570; Cando, 200 AD3d at 752-753; Greco v Archdiocese of N.Y., 268 AD2d 300, 301 [1st Dept 2000]).
Contrary to the majority, I am of the opinion that DAL made the jobsite unsafe by placing in a work area an open A-frame ladder that appeared to be defective, as confirmed by the blue painter's tape on it, which in accordance with DAL's on-site foreman's testimony, meant that it was defective and should have been discarded (see Church, 99 NY2d at 112). Furthermore, there was testimony that, although a worker was not supposed to use any other trade's ladders, everybody at the jobsite did it, and DAL's senior project manager conceded that if a ladder was open, set up and unattended, there was no way of preventing other trades from using it.
The cases cited by the majority, Vargas v New York City Tr. Auth. (60 AD3d 438 [1st Dept 2009]) and Ramos v Pet Mkt. W. 57th St., Inc. (114 AD3d 423 [1st Dept 2014]) are distinguishable.
Unlike this case, in Vargas, the subcontractor's employees loaned [*13]plaintiff an A-frame ladder that was not defective. After determining that the open ladder was not tall enough to reach the top of the spherical boiler he was working on, plaintiff closed the ladder, leaned it against the boiler, and attempted to climb up the closed ladder. He was injured when the ladder collapsed from the curved side of the boiler. The subcontractor was found to have no duty to provide the plaintiff with equipment, and there was no "supervision, direction, or control over plaintiff's work" (60 AD3d at 441). The decision does not address any exception resulting from the launching of an instrument of harm because on the facts of the case, none existed (see id.). Ramos is also distinguishable from this case because it does not specifically address the issue of launching an instrument of harm. Rather, the opinion finds the subcontractor was not on the jobsite, and had no duty to provide the plaintiff with equipment, specifically a ladder, adequate to perform the task of painting a ceiling. Ramos also cites to Vargas, finding the subcontractor had "no supervision, direction or control over the plaintiff's work" (114 AD3d at 424).
In this case, DAL was on the jobsite, aware that the ladder was defective and should have been discarded. DAL was also aware that other trades took unattended ladders for their work and allowed an employee to leave a defective ladder unattended in the middle of the worksite. Unlike Vargas and Ramos, in this case, there is an issue of fact as to whether DAL in discharging its contractual obligation created an unreasonable risk of harm to others by launching an instrument of harm, creating a duty to the plaintiff.
DAL is not entitled to summary judgment dismissing defendants' contractual indemnification cross-claim at this juncture because at least one of the indemnification provisions in its subcontract with defendants also contains a negligence trigger, and there has yet to be a finding that DAL was free from fault (see e.g. Agurto v One Boerum Dev. Partners LLC, 221 AD3d 442, 444 [1st Dept 2023]; McKinney v Empire State Dev. Corp., 217 AD3d 574, 576 [1st Dept 2023]).
Accordingly, I would deny DAL's motion for summary judgment dismissing plaintiff's common-law negligence claim and defendants' contractual indemnification cross-claim.
Order Supreme Court, Bronx County (Lucindo Suarez, J.), entered October 28, 2022, modified, on the law, to grant DAL's motion as to the Labor Law § 200 and common-law negligence claims, and contractual indemnification cross-claim as against it, and to deny Rockefeller and JRM's cross-motion as to their contractual indemnification cross-claim against DAL, and otherwise affirmed, without costs. The Clerk is directed to enter judgment dismissing the complaint and all cross-claims as against DAL.
Opinion by Oing, J. All concur except Mendez, J. who dissents in an Opinion.
Kern, J.P., Oing, Moulton, Gesmer, Mendez, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE [*14]SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 2, 2024

Footnotes

Footnote 1: Plaintiff's wife also asserted a claim for loss of consortium. I will refer to the injured plaintiff for simplicity as "plaintiff."